**Electronically Filed
Supreme Court
SCWC-12-0000867
23-NOV-2015
08:57 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

KONDAUR CAPITAL CORPORATION,
Respondent/Plaintiff-Appellee,

vs.

LEIGH MATSUYOSHI,
Petitioner/Defendant-Appellant.

SCWC-12-0000867

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000867; CIVIL NO. 12-1-0185)

November 23, 2015

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

In Ulrich v. Security Investment Co., 35 Haw. 158
(Haw. Terr. 1939), we held that a personal property mortgagee
seeking to enforce a non-judicial foreclosure sale bears the
burden of establishing that the sale was conducted in a manner
that is fair, reasonably diligent, and in good faith and that an
adequate price was procured for the property.  In the years

after Ulrich was decided, the legislature made several amendments to the non-judicial foreclosure statute, and the viability of Ulrich in light of these amendments, as well as Ulrich's applicability to real property non-judicial foreclosures, has recently been questioned, with federal courts in Hawai'i reaching conflicting results.[1]

We hold that the duties set forth in Ulrich remain viable law and are applicable to non-judicial foreclosures of real property mortgages.[2] Additionally, in situations where a mortgagee acts as both the seller and the purchaser of the subject property at a non-judicial foreclosure sale, that mortgagee, or its quitclaim transferee or non-bona fide successor, bears the burden of proving compliance with the requirements of Ulrich.

## I. FACTUAL BACKGROUND/PROCEDURAL HISTORY

### A. The Underlying Mortgage and Related Proceedings

In February 2007, Jun Matsuyoshi and others conveyed a residential property located in Līhuʻe, Kauaʻi (Property) by

---

[1]    Compare Lima v. Deutsche Bank Nat'l Trust Co., 943 F. Supp. 2d 1093 (D. Haw. 2013), with Field v. Bank of Am., N.A. (In re Gibbs), 522 B.R. 282 (Bankr. D. Haw. 2014).

[2]    All references to "non-judicial foreclosures" in this opinion do not encompass non-judicial foreclosures conducted pursuant to Hawai'i Revised Statutes (HRS) Chapter 667, Part II. When referring to this type of foreclosure, a specific statutory designation is included. Similarly, the use of "foreclosure statute" in this opinion, when not modified by a specific statutory section, excludes HRS Chapter 667, Part II.

warranty deed to Leigh Matsuyoshi (Matsuyoshi).  The following month, Matsuyoshi signed a mortgage on the Property (Mortgage) and a promissory note (Note) promising to pay $500,000 to Resmae Mortgage Corporation (Resmae) in return for a loan that Matsuyoshi had received.

Resmae recorded the Mortgage with the Bureau of Conveyances (Bureau).  The Mortgage listed Matsuyoshi as the borrower of $500,000, and it included an acceleration and power of sale clause, which provided, among other things, that Matsuyoshi would be given at least 30 days to cure a default of payment.

In May 2008, Lester K.M. Leu (Leu), an attorney authorized to act on behalf of Resmae Liquidation Properties LLC (RLP), sent a Notice of Intent to Foreclose to Matsuyoshi (notice of default).  The notice of default stated that Matsuyoshi's loan was in default because scheduled payments had not been made since April 1, 2008, and that the amount due was $9,704.34.  The notice of default stated further that Matsuyoshi must pay this amount by June 20, 2008, or the loan would be accelerated and the Property referred for foreclosure action.

In August 2008, an assignment of the Mortgage from Resmae to RLP was recorded.  Matsuyoshi was personally served with a Notice of Mortgagee's Non-Judicial Foreclosure Under Power of Sale (Notice of Sale).  The Notice of Sale stated that

RLP intended to sell the Property at an auction to be held in Honolulu on November 13, 2008. The Notice of Sale also stated that the Property would be sold "AS IS" and "WHERE IS."

Thereafter, the Property was auctioned off at a foreclosure sale in Honolulu. In the Mortgagee's Affidavit of Foreclosure Under Power of Sale (Affidavit of Sale), Leu certified that in compliance with Hawai'i Revised Statutes (HRS) §§ 667-5 through 667-10[3] and the Note and Mortgage, Mortgagee or its representative, or Affiant, conducted the public auction sale on November 13, 2008, "at the date, time, and place set forth in the Notice and under the conditions stated therein, and Affiant, or her representative, declared the Property sold to [RLP] for $416,900.20, which was the highest bid at said sale." Leu stated that the default remained uncured at the time of sale. On November 17, 2008, the Affidavit of Sale was recorded in the Bureau.

In January 2009, RLP executed a quitclaim deed, which was subsequently recorded, conveying the Property to itself. In July 2010, a quitclaim deed was executed by RLP conveying the Property to Kondaur Capital Corporation (Kondaur).[4] The

---

[3]    HRS §§ 667-5 to 667-10 governed the process of foreclosure by power of sale (i.e., non-judicial foreclosure) and were within Part I of Chapter 667. HRS §§ 667-5 to 667-8 were repealed by the legislature in 2012. 2012 Haw. Sess. Law Act 182, § 50 at 684.

[4]    In relevant part, the quitclaim deed recited that

(continued . . .)

quitclaim deed expressly stated that "[n]otwithstanding anything in this deed to the contrary, [RLP] makes no representations, warranties or promises regarding any claims by LEIGH MATSUYOSHI, her heirs, successors or assigns."  Kondaur recorded its quitclaim deed the following year, in February 2011.  Thereafter, Kondaur gave Matsuyoshi notice to vacate; Matsuyoshi did not leave the Property.

### B.  Kondaur's Ejectment Action Against Matsuyoshi

On June 5, 2012, Kondaur filed a complaint for possession of the Property against Matsuyoshi in the Circuit Court of the Fifth Circuit (circuit court).  The complaint requested a judgment for immediate and exclusive possession of the Property and a writ of possession.  The complaint stated that Kondaur had "acquired title and current ownership of the

---

(. . . continued)
> for ONE AND NO/100 DOLLARS ($1.00) and other valuable consideration paid by [Kondaur], the receipt of which is hereby acknowledged, [RLP] does hereby release, remise and quitclaim unto [Kondaur], as TENANT IN SEVERALTY, his/her heirs, personal representatives, successors and assigns, all of that certain real property described in Exhibit "A" attached hereto and made a part hereof.

Exhibit A to the quitclaim deed refers to

> [a]ll of that certain parcel of land situate at Kalapaki, Lihue, District of Puna, Island and County of Kauai, State of Hawaii, being LOT 148 of the "LIHUE TOWN ESTATES", as shown on File Plan Number 1408, filed in the Bureau of Conveyances of the State of Hawaii, and containing an area of 6,000 square feet, more or less.

Exhibit A further indicates Matsuyoshi as the previous owner.

Property through a Quitclaim Deed recorded on February 24, 2011."

On June 27, 2012, Kondaur filed a Motion for Summary Judgment Against All Defendants on Complaint filed June 5, 2012 (MSJ). Kondaur requested that the circuit court grant the MSJ and enter a Judgment for Possession of the Property for Kondaur and against Matsuyoshi, issue a Writ of Possession, enter the judgment as final, and set a time and date for a trial on damages. A declaration by Ann Pham (Pham) attached to the MSJ stated that she was an asset manager for Kondaur and a custodian of Kondaur's records. Pham declared that according to regular business records maintained by Kondaur, Kondaur owned the Property pursuant to Kondaur's quitclaim deed. Pham also declared that Kondaur had given Matsuyoshi notice to vacate, and Matsuyoshi "has so far continued to reside at the Property and has otherwise failed or refused to leave." Also attached to the MSJ were several exhibits.[5]

---

[5] Exhibit A was a certified copy of Kondaur's quitclaim deed.

Exhibit B was a certified copy of RLP's quitclaim deed.

Exhibit C was a certified copy of the Mortgagee's Affidavit of Foreclosure Under Power of Sale. Exhibit C also included a copy of the deed from Jun Matsuyoshi, et al., to Matsuyoshi; the Note; the Mortgage; the Assignment of Mortgage and Note from Resmae to RLP; the notice of default; the Notice of Sale; a list of parties "who have recorded encumbrances, liens, and/or other claims against the Property or who have requested notice" and received the Notice of Sale; the returns and acknowledgments of service from those parties listed; an Affidavit of Posting of the Notice of Sale on the Property; an Affidavit of Publication of the Notice of Sale in the Honolulu

(continued . . .)

In its memorandum in support of the MSJ, Kondaur asserted that it had undisputed title to the Property and that Matsuyoshi was residing on the Property as a trespasser. Kondaur argued that its quitclaim deed was prima facie evidence of the conveyance to it from RLP, and that, therefore, it was the owner of the Property and entitled to immediate and exclusive possession.

Kondaur also contended that the Affidavit of Sale was evidence that the power of sale was duly executed. Kondaur maintained that the foreclosure sale extinguished Matsuyoshi's interest in the Property and that RLP "subsequently conveyed the Property to Kondaur by virtue of the Quitclaim Deed dated July 14, 2010."

Kondaur asserted that because Matsuyoshi failed to cure her default in payments prior to the sale, "she is without standing to contest the validity of the foreclosure conducted by [RLP] and the superior title to the Property subsequently acquired by Kondaur." Kondaur concluded that Matsuyoshi had no interest in the Property, Matsuyoshi must vacate it immediately, and a judgment for possession and writ of ejectment should be issued.

---

(. . . continued)
Star-Bulletin; and a report from the Department of Defense Manpower Data Center stating that Matsuyoshi was not an active duty member of the military.

On July 6, 2012, Kondaur requested an entry of default against Matsuyoshi pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 55(a) "for her failure to answer or otherwise respond" to Kondaur's complaint. Default was entered by the clerk of the circuit court on the same day.

On August 15, 2012, Matsuyoshi filed, through counsel, her opposition to the MSJ, which was later amended on August 21, 2012. Matsuyoshi acknowledged that she "fell behind on her mortgage payments," but she maintained that technical violations of HRS § 667-5 voided the foreclosure sale. Matsuyoshi argued "that all notices and acts required by the power contained in the [M]ortgage shall be complied with." According to Matsuyoshi, RLP's foreclosure against her was void because RLP did not comply with the notice requirement under the Mortgage and because the auction sale was conducted on O'ahu rather than on Kaua'i, the county where the Property is located. Finally, Matsuyoshi noted that Kondaur stood in privity of contract with RLP based on the quitclaim deed that Kondaur received from RLP.

In its reply, Kondaur contended that Matsuyoshi's "failure . . . to establish by admissible evidence that the Note and Mortgage were not in default at the time of the non-judicial foreclosure is dispositive." Kondaur maintained that Matsuyoshi

presented no admissible evidence showing that she did not receive notice of her default under the terms of the Mortgage.

At the hearing on the MSJ,[6] Matsuyoshi argued that the foreclosure sale violated the foreclosure statute because it was carried out on Oʻahu when the Property was on Kauaʻi.  Matsuyoshi contended that the sale on Oʻahu precluded her from exercising her right to redeem the Property.  Matsuyoshi also emphasized that RLP "was the only bidder" at the foreclosure sale.

Kondaur replied that, in 2008, "there was no prohibition in . . . [HRS] Chapter 667 . . . that prohibited a lender from doing a foreclosure sale [for a property located on Kauaʻi] on the island of Oahu."  According to Kondaur, there was no prejudice because the purpose of a judicial sale is to get the highest price possible, and "the market on Oahu is obviously much bigger than the market on Kauai in terms of prospective purchasers."[7]

At the conclusion of the hearing, the circuit court granted Kondaur's MSJ.  On September 18, 2012, the circuit court

---

[6]     The Honorable Randal G.B. Valenciano presided.

[7]     In relation to this point, Matsuyoshi argued:

And if Plaintiff's argument is Oahu has a bigger market, then why aren't these foreclosure sales uniformly conducted in Los Angeles?  Why aren't they conducted in New York City?  Why aren't they conducted right next to the bank that has the ability to pay for these large mortgages in the first place and out bid [sic] each other?

entered its "Order Granting [Kondaur's] [MSJ]" (MSJ Order), which included an order for a writ of possession to issue. The circuit court also issued its judgment (MSJ Judgment). On September 20, 2012, the circuit court issued a writ of possession.

After the MSJ Judgment was rendered, Matsuyoshi submitted a declaration averring that she was "absolutely positive that the [M]ortgage . . . was not signed by [her] before a notary public" and that the notarization on the Mortgage is false. Further, Matsuyoshi claimed that the mortgage documents were not explained to her, nor was she given copies of the documents that she signed. Finally, Matsuyoshi declared that she did not sign the mortgage application and that the amounts listed as her income in the application are false. Matsuyoshi filed post-judgment motions, including a Motion to Set Aside the MSJ Judgment and a Motion to Set Aside Entry of Default pursuant to HRCP Rule 55(c). Matsuyoshi contended that the entry of default should be set aside because her post-judgment declaration presented a meritorious defense to Kondaur's action. The circuit court denied the Motion to Set Aside Entry of Default.

Matsuyoshi timely filed a Notice of Appeal from the MSJ Judgment, but she did not appeal from the circuit court's order denying her post-judgment motions.

## II.   APPELLATE PROCEEDINGS

### A.   Initial Disposition of the Intermediate Court of Appeals

Matsuyoshi's Opening Brief maintained that the circuit court erred in granting Kondaur's MSJ.  Matsuyoshi argued that where the mortgagee is also the purchaser of a foreclosed property, the mortgagee should be held to the strictest standard of good faith and diligence.  Consistent with these requirements, Matsuyoshi reasoned that the mortgagee has a duty "to obtain for the [P]roperty as large a price as possible."  Matsuyoshi contended that "[t]he sale of property located on Kaua'i at the front entrance to the First Circuit Courthouse did not show reasonable diligence and good faith in an endeavor to obtain the best possible prices [sic] consistent with such diligence and good faith."

In its Answering Brief, Kondaur argued that, because "Matsuyoshi never set aside the default that was entered against her," she was "barred" from challenging Kondaur's MSJ or defending the complaint.  Kondaur recognized that Matsuyoshi did eventually file a motion to set aside the default, but argued that Matsuyoshi "failed to present any discernible argument to the [circuit court] that her default should be set aside" and that, therefore, the Intermediate Court of Appeals (ICA) should not consider her untimely arguments.

11

Kondaur further contended that the circuit court properly granted its MSJ because it presented undisputed evidence of title to the Property and that Matsuyoshi was thus residing there unlawfully and without permission.  Kondaur maintained that Matsuyoshi's contention that the foreclosure sale was void because it occurred on Oʻahu must fail because at the time of the sale, Hawaii's foreclosure statute did not prohibit the sale of the Property on Oʻahu, the power of sale contained in the Mortgage did not prohibit the lender from conducting the auction on Oʻahu, and "the decision to have the public auction on Oʻahu was consistent with the stated purposes of the . . . foreclosure statute."  Kondaur additionally contended that conducting the auction on Oʻahu was reasonable because Oʻahu was a larger market, Matsuyoshi failed to establish that she was prejudiced by the occurrence of the foreclosure sale on Oʻahu, and Matsuyoshi presented no evidence that she intended to or could have bid at the auction.

In her Reply Brief, Matsuyoshi maintained that, regardless of the effect of the entry of default, "the MSJ should not have been granted because the material facts did not show that Kondaur was entitled to judgment as a matter of law." Matsuyoshi argued that she was not bound by the recitations in Kondaur's quitclaim deed because she was not a party to the

conveyance.  Further, Matsuyoshi contended that Kondaur's quitclaim deed "establishes only that Kondaur obtained whatever interest, if any, that [RLP] . . . had in the [P]roperty."

Concerning the sale on Oʻahu, Matsuyoshi asserted that merely following the foreclosure statute was not sufficient and that the sale on Oʻahu was unreasonable.  Matsuyoshi argued that she did not need to demonstrate that she was prejudiced by the sale on Oʻahu and contended that this would be impossible to prove without a comparable sale occurring on Kauaʻi.

On March 7, 2014, the ICA issued its Memorandum Opinion (Opinion).  The ICA concluded that because Matsuyoshi "raise[d] genuine issues as to the validity of the Mortgage" in her post-judgment declaration, summary judgment for Kondaur was erroneously granted.  The ICA also held that as a consequence of the default, it could consider whether the factual allegations in Kondaur's complaint were "well-pled," and the ICA concluded that they were not.  The ICA declined "to reach further issues raised by the parties," vacated the MSJ Judgment, and remanded the case for proceedings consistent with its Opinion.

Kondaur filed an application for writ of certiorari to this court on May 15, 2014, challenging the ICA's decision.[8]

_____

[8]     The following questions were presented:

I.     Whether the ICA erred by reversing the Circuit
       Court's decision to grant summary judgment in favor
                                        (continued . . .)

13

This court granted certiorari, and in an opinion published on October 23, 2014, we held that the ICA erred in treating the entry of default as if it were a default judgment and then evaluating whether the allegations in the complaint were well-pled.  Kondaur Capital Corp. v. Matsuyoshi, 134 Hawai'i 342, 351—52, 341 P.3d 548 (2014).  This court additionally held that "[w]hen reviewing a summary judgment, an appellate court's consideration of the record is limited to those materials that were considered by the trial court in ruling on the motion."  Id. at 350, 341 P.3d at 556.  Because the ICA relied on "the post-judgment Matsuyoshi Declaration as a basis to find disputed material facts" that would preclude summary judgment, we concluded that the ICA erred, vacated the ICA's Judgment on Appeal, and "remand[ed] the case to the ICA to consider the further issues that it 'decline[d] to reach' that were 'raised by the parties' on appeal."  Id. at 352, 341 P.3d at 558.

**B.    The ICA's Post-Remand Summary Disposition Order**

On November 19, 2014, the ICA issued its post-remand summary disposition order (SDO), which affirmed the MSJ Judgment.

---

(. . . continued)
            of Petitioner based on evidence that was not a matter
            of record at the time the Circuit Court considered
            the motion.

    II.    Whether on *de novo* review this Court should affirm
           the Circuit Court's judgment granting a summary
           judgment in favor of Petitioner.

14

In particular, the ICA held that summary judgment in favor of Kondaur was properly granted, explaining that Kondaur met its initial burden of demonstrating a prima facie case of ejectment by submitting "admissible evidence of ownership and title to the [Property] in the form of exhibits attached to its MSJ, which included a certified copy of its quitclaim deed and Ann Pham's affidavit."

The ICA rejected Matsuyoshi's arguments concerning the alleged invalidity of Kondaur's title as a result of the foreclosure sale being conducted in a different county than where the Property is located.  The ICA reasoned that the applicable version of HRS § 667-5 did not require the "foreclosure sale be held in the county where the subject property is located, and nothing in the record indicates that the mortgagee failed to fulfill its duty to exercise reasonable diligence to secure the best price for the Property" "when it sold the Property for $416,900.20."[9]

C.    **Matsuyoshi's Application for Writ of Certiorari**

On April 6, 2015, Matsuyoshi filed an application for writ of certiorari seeking review of the ICA's post-remand SDO.

---

[9]    Matsuyoshi also raised to the ICA a second point of error on appeal—whether the circuit court erred in denying Matsuyoshi's Motion to Set Aside the MSJ Judgment.  The ICA held that it "lack[ed] jurisdiction to address Matsuyoshi's second error raised on appeal" "because Matsuyoshi did not appeal the November 14, 2012 Post-Judgment Order denying her HRCP Rule 60(b) Motion."

15

Matsuyoshi argues that the ICA misapplied the summary judgment standard by requiring her to present evidence when Kondaur—the movant in this case—had failed to present a prima facie case establishing that the sale of the Property was valid. Relying on Ulrich and analogous authorities setting forth the common law governing fiduciaries and quasi-fiduciaries, Matsuyoshi argues that, because Kondaur has "the ultimate burden of proof both as a plaintiff and as the direct quitclaim privy of [RLP] who carried out the O'ahu-Self-Sale," it "was required to establish in its moving papers that the sale was properly and fairly conducted and that the price was adequate," particularly when the mortgagee is self-dealing in a manner that creates an inherent conflict of interest. Applying this principle, Matsuyoshi contends that Kondaur failed to present any evidence that it acted diligently to secure the best price for the Property.

Matsuyoshi additionally argues that even if Kondaur satisfied its initial burden, genuine issues of material fact existed as to whether RLP violated the foreclosure statute and its duties under the power of sale contained in the Mortgage. Matsuyoshi maintains that the auction sale conducted on O'ahu was itself evidence that RLP did not act diligently, "as potential bidders on Kaua'i necessarily would have had to purchase an airplane ticket and travel to O'ahu for the sale, while potential

16

bidders on O'ahu could not view the [P]roperty unless they traveled to Kaua'i." According to Matsuyoshi, this dilemma was exacerbated by the fact that one of RLP's sale terms was to convey the Property to the winning bidder "AS IS."[10]

In response, Kondaur argues that the ICA correctly affirmed the circuit court's grant of its MSJ because Kondaur satisfied its initial burden to demonstrate a prima facie case of ejectment, while Matsuyoshi correspondingly failed to raise a genuine issue of material fact. Kondaur contends that requiring a third-party successor-in-interest such as Kondaur to establish a predecessor-in-interest's reasonable diligence is tantamount to requiring such a successor-in-interest to disprove every possible defense to an ejectment action, which a summary judgment movant is not required to do. Further, Kondaur argues that Ulrich is consistent with the view that the mortgagor is the party who must introduce "credible evidence to support [his or] her alleged defense that the sale price at auction was

---

[10] Matsuyoshi also identifies technical defects that allegedly voided RLP's non-judicial foreclosure of the Property. Matsuyoshi argues that the notice of default that RLP sent did not comply with the notice requirements of the Mortgage and was therefore defective. Additionally, Matsuyoshi contends that the Honolulu Star-Bulletin—the newspaper in which the notice of sale for the Property was published—was not a newspaper of general circulation in Kaua'i County in 2008, thus violating the publication requirement of HRS § 667-5(a)(1). In light of our disposition of other issues raised by Matsuyoshi, we do not address the asserted technical defects.

17

fraudulent"—a burden that Matsuyoshi failed to satisfy in this case.

Finally, Kondaur argues that Matsuyoshi's challenge to the venue of the non-judicial foreclosure auction is without merit because neither the applicable version of the foreclosure statute nor the power of sale contained in the Mortgage required the sale to be conducted in the same county as where the Property is located.

Matsuyoshi asserts in her reply that assigning the burden to Kondaur of proving the validity of the non-judicial foreclosure sale is consistent with the burden-shifting approach employed in a summary judgment analysis, and that Kondaur is not being asked to disprove every possible defense that Matsuyoshi may have. Matsuyoshi maintains "that where the ejectment plaintiff is the mortgagee (or its non-bona fide purchaser transferee standing in its shoes)," this requirement "is not a 'defense' at all, but rather an element of the plaintiff's claim."

**III. DISCUSSION**

**A. Ulrich and the Division between Federal Courts in Hawaiʻi as to Its Continued Vitality**

More than 70 years ago, in Ulrich v. Security Investment Co., 35 Haw. 158 (Haw. Terr. 1939), this court detailed legal principles governing the burden of proof in cases

arising from foreclosure sales.  At stake in Ulrich was the mortgagor's interest in his law firm and chattels.  35 Haw. at 159–60.  Pursuant to the power of sale in the underlying mortgage, and after the mortgagor defaulted on the loan, the mortgagee commenced non-judicial foreclosure proceedings.  Id. at 162–64.  However, the mortgagee "kept the sale as quiet as possible," did not give adequate personal or public notice to the mortgagor of the impending foreclosure, and acted both as the auctioneer and the purchaser during the auction.  Id. at 172, 174.  In addition, the description of the property to be sold was such that it failed to "inform the public of the nature of the property to be offered for sale," and prospective buyers were not afforded the opportunity to inspect the property.  Id. at 173.

This court held that a mortgagee is required to "use all fair and reasonable means in obtaining the best prices for the property on sale," such that where "the sale [i]s not made in good faith, that the amount received upon the sale was inadequate and that the mortgagee took a wrongful and unfair advantage of the mortgagor, the foreclosure sale must be set aside."  Id. at 168.  Further, this court declared that "where the mortgagee himself purchases at the sale, the burden is on him to show that the sale was regularly and fairly conducted in every particular, and that an adequate price was paid for the

goods sold." Id. (citation omitted) (internal quotation mark omitted). These requirements were promulgated by the court while fully recognizing that their application may sometimes mean obligating a mortgagee to act above and beyond the statutory requirements. See id. at 172–73 (recognizing that the foreclosure statute did not require that the foreclosure sale be publicized, but in any event finding that the mortgagee failed to act reasonably by failing to do so).

Under the facts of Ulrich, the court ultimately determined that the mortgagee "failed to exercise reasonable diligence and good faith in an endeavor to obtain the best possible prices consistent with such diligence and good faith." Id. at 170. Accordingly, the court vacated and set aside the foreclosure sale. Id. at 185–86.

Ulrich has never been overruled by this court. But because HRS § 667-5 has been amended several times since Ulrich was decided in 1939, a federal district court has raised doubts as to the continued vitality of its holding. In Lima v. Deutsche Bank Nat'l Trust Co., 943 F. Supp. 2d 1093 (D. Haw. 2013), the U.S. District Court for the District of Hawai'i ruled that Ulrich was not applicable to the facts of that case for two reasons: first, because Ulrich involved a chattel mortgage, while Lima involved a real property mortgage; and, second, because none of the principles laid out in Ulrich were included

20

by the Hawai'i legislature in its amendment to HRS § 667-5 in

2008.[11]  Id. at 1099-1100.  Hence, although not directly so

_____

[11]     HRS § 667-5 (Supp. 2008) provides as follows:

(a) When a power of sale is contained in a mortgage, and where the mortgagee, the mortgagee's successor in interest, or any person authorized by the power to act in the premises, desires to foreclose under power of sale upon breach of a condition of the mortgage, the mortgagee, successor, or person shall be represented by an attorney who is licensed to practice law in the State and is physically located in the State. The attorney shall:

   (1) Give notice of the mortgagee's, successor's, or person's intention to foreclose the mortgage and of

   the sale of the mortgaged property, by publication of the notice once in each of three successive weeks (three publications), the last publication to be not less than fourteen days before the day of sale, in a newspaper having a general circulation in the county in which the mortgaged property lies; and

   (2) Give any notices and do all acts as are authorized or required by the power contained in the mortgage.

(b) Copies of the notice required under subsection (a) shall be:

   (1) Filed with the state director of taxation; and

   (2) Posted on the premises not less than twenty-one days before the day of sale.

(c) Upon the request of any person entitled to notice pursuant to this section and sections 667-5.5 and 667-6, the attorney, the mortgagee, successor, or person represented by the attorney shall disclose to the requestor the following information:

   (1) The amount to cure the default, together with the estimated amount of the foreclosing mortgagee's attorneys' fees and costs, and all other fees and costs estimated to be incurred by the foreclosing mortgagee related to the default prior to the auction within five business days of the request; and

   (2) The sale price of the mortgaged property once auctioned.

(continued . . .)

stating, the district court essentially held that Ulrich had been overruled by the legislature by virtue of its silence—by failing to expressly include any of Ulrich's requirements in the language of HRS § 667-5.[12]

On the other hand, in Field v. Bank of Am., N.A. (In re Gibbs), 522 B.R. 282 (Bankr. D. Haw. 2014), the Bankruptcy Court for the District of Hawai'i disagreed with the Lima court, held that Ulrich continued to be good law, and applied its requirement that a mortgagee must use all fair and reasonable means to maximize the sale price of the property sold at a foreclosure sale. Id. at 289—91. The fact that Ulrich

_____

(. . . continued)

        (d) Any sale, of which notice has been given as aforesaid, may be postponed from time to time by public announcement made by the mortgagee or by some person acting on the mortgagee's behalf. Upon request made by any person who is entitled to notice pursuant to section 667-5.5 or 667-6, or this section, the mortgagee or person acting on the mortgagee's behalf shall provide the date and time of a postponed auction, or if the auction is cancelled, information that the auction was cancelled. The mortgagee within thirty days after selling the property in pursuance of the power, shall file a copy of the notice of sale and the mortgagee's affidavit, setting forth the mortgagee's acts in the premises fully and particularly, in the bureau of conveyances.

        (e) The affidavit and copy of the notice shall be recorded and indexed by the registrar, in the manner provided in chapter 501 or 502, as the case may be.

        (f) This section is inapplicable if the mortgagee is foreclosing as to personal property only.

    [12]    The Lima court judge held similarly in Bald v. Wells Fargo Bank, Civil No. 13—00135 SOM/KSC, 2013 WL 3864449 (D. Haw. July 25, 2013), appeal filed, No. 13-16622, 2013 WL 3864449 (9th Cir. Aug. 12, 2013), which involved a self-dealing foreclosure sale of real property by the mortgagee. Id. at *4-*5.

22

concerned a chattel mortgage instead of a real property mortgage was immaterial, according to the bankruptcy court, because the foreclosure statute in effect at that time did not expressly exclude from its provisions chattel mortgages.[13]  Id. at 290. Further, the bankruptcy court was unpersuaded by the reasoning of the district court in Lima concerning the legislative history of HRS § 667-5.  In the bankruptcy court's view, the legislature approved of the principles embodied by Ulrich because the subsequent amendments it made to HRS § 667-5 did not expressly overrule Ulrich.  Id.

### 1. The Amendments to the Foreclosure Statute are Not Inconsistent with Ulrich

At the time that Ulrich was decided, the statutory provisions governing non-judicial foreclosures were RLH §§ 4724-4728 (1935).  Ulrich, 35 Haw. at 163.[14]  Subsequent amendments to

---

[13]     The bankruptcy court cited Chapter XXXIII of the Acts of 1874 as the operative statute.  In re Gibbs , 522 B.R. at 290 n.24.  Although the applicable statutory provisions were "sections 4724 to 4728, [Revised Laws of Hawai'i (RLH)] 1935," Ulrich, 35 Haw. at 163,  the bankruptcy court's reasoning is equally supported under RLH §§ 4724-4728 (1935), which also did not differentiate between chattel mortgages and real property mortgages.

[14]     The relevant parts of RLH § 4724 (1935), the former version of HRS § 667-5, provided as follows:

> **Sec. 4724.**  Notice of foreclosure; affidavit after sale.  When a power of sale is contained in a mortgage, the mortgagee, or any person having his estate therein, or authorized by such power to act in the premises, may, upon a breach of the condition, give notice of his intention to foreclose the mortgage, by publication of such notice . . . .  He shall, within thirty days after selling the property in pursuance of the power, file a copy of the notice of sale and his affidavit, setting forth his acts in the

(continued . . .)

the foreclosure statute support the view that Ulrich remains viable law.[15]  After Ulrich was decided in 1939, RLH § 4724 was not amended until 1967, and that amendment concerned only a requirement that the affidavit and copy of the notice of the foreclosure sale be recorded and indexed.  1967 Haw. Sess. Laws Act 256, § 1 at 383.  Both the accompanying House Standing Committee Report and the Senate Standing Committee Report reflected that the purpose of the 1967 amendment was "to standardize the recording procedures in the Bureau of Conveyances," and neither Ulrich nor its holding was referenced.[16]

A substantive amendment was effectuated in 1972, and it was at this time that HRS § 667-5 was made inapplicable to foreclosures of personal property mortgages.  1972 Haw. Sess. Laws Act 90, §9 at 362.  The legislative history related to the 1972 amendment did not touch upon Ulrich, and the committee reports stated only that the amendments were intended "to

_____

(. . . continued)
        premises fully and particularly, in the bureau of
        conveyances, in Honolulu.  The affidavit and copy of the
        notice shall be recorded by the registrar, with a notice of
        reference thereto in the margin of the record of the
        mortgage deed, if recorded in his office.

[15]     Kondaur apparently does not contest Ulrich's application to this case, and, therefore, the initial dispute concerns the correctness of the ICA's assignment between the parties of the burden of proving the satisfaction of the Ulrich requirements.

[16]     H. Stand. Comm. Rep. No. 828, in 1967 House Journal, at 801; S. Stand. Comm. Rep. No. 450, in 1967 Senate Journal, at 1051.

eliminate inconsistencies with the rules of court; delete outmoded provisions; make improvements of a technical nature; and transfer procedural matters to rules of court."[17] The Report of Committee on Coordination of Rules and Statutes, referenced by the legislative reports accompanying the 1972 amendment,[18] stated that the addition to HRS § 667-5 of the paragraph excluding personal property foreclosures from the foreclosure statute was meant "to clarify the relationship of this section to the Uniform Commercial Code, 490: 9-501(4)." Report of Committee on Coordination of Rules and Statutes Vol. 2, § 667-5 (1971). Thus, the exclusion of personal property foreclosures was not precipitated by the decision in Ulrich, but instead it was intended to conform HRS § 667-5 to the law governing secured transactions of personal property.

The 1984 amendment also did not affect the substance of HRS § 667-5, as it functioned only to authorize the revisor of statutes to "change statutory language by removing gender-specific terminology without altering the sense, meaning, or effect of any act," whenever the revisor supplements or replaces

---

[17] H. Stand. Comm. Rep. No. 330-72, in 1972 House Journal, at 772; S. Stand. Comm. Rep. No. 623-42, in 1972 Senate Journal, at 1006—07.

[18] H. Stand. Comm. Rep. No. 330-72, in 1972 House Journal, at 772; S. Stand. Comm. Rep. No. 623-42, in 1972 Senate Journal, at 1006—07; Spec. Com. Rep. 9, in 1972 House Journal, at 1115—32; Spec. Com. Rep. 7, in 1972 Senate Journal, at 697—741.

volumes of the HRS.[19] The 1989 amendment merely added a requirement that copies of foreclosure sale notices should be filed with the state director of taxation. 1989 Haw. Sess. Laws Act 20, § 5 at 56—57. Again, the underlying legislative history was silent about Ulrich and the requirements that it set forth.[20]

The last amendment to HRS § 667-5 before its repeal was in 2008. 2008 Haw. Sess. Laws Act 138, § 1 at 370—71. That amendment expanded the protections it guaranteed mortgagors by, among other things, requiring mortgagees to retain an attorney who is licensed to practice and physically present in the State. Id. This requirement was meant to "ensure that interested parties have means to obtain information from a person with a local presence and the ability to provide useful information."[21] This rationale was echoed by the accompanying Senate Standing Committee Report and the House Standing Committee Report.[22] Again, there was no indication that the principles set forth in Ulrich were to be nullified or modified.

---

[19] 1984 Haw. Sess. Laws Act 90, § 1 at 166; H. Stand. Comm. Rep. No. 85-84, in 1984 House Journal, at 837; S. Stand. Comm. Rep. No. 635-84, in 1984 Senate Journal, at 1332.

[20] H. Stand. Comm. Rep. No. 421, at 1001; S. Stand. Comm. Rep. No. 1257, at 1274—75.

[21] Conf. Comm. Rep. No. 3-08, in 2008 House Journal, at 1710—11, 2008 Senate Journal, at 793—94.

[22] H. Stand. Comm. Rep. No. 1192-08, in 2008 House Journal, at 1450—51; S. Stand. Comm. Rep. No. 2108, in Senate Journal, at 917—18.

The foregoing amendments do not indicate that the legislature explicitly or implicitly disapproved of Ulrich.  If the legislature had sought to express disapproval of Ulrich, it could have fashioned, for example, a presumption of validity, conclusive or otherwise, in instances where a foreclosure sale is conducted in accordance with the foreclosure statute and the underlying mortgage, as the legislature did with regard to HRS § 667-34 (Supp. 2008) ("[A]ny foreclosure sale held in accordance with this part shall be conclusively presumed to have been conducted in a legal, fair, and reasonable manner.").[23]  See,

---

[23]  HRS § 667-34 is encompassed by Part II of Chapter 667 of the HRS, which sets forth an alternative power of sale process with more exacting standards, compliance with which would provide greater finality to a mortgagee's foreclosure sale.  See HRS §§ 667-21 to 667-42 (Supp. 2008).  Those standards include, under HRS § 667-22 (Supp. 2008), a more detailed notice of intention to foreclose than that required by HRS § 667-5.  Additionally, HRS §§ 667-25, 667-29, 667-30, and 667-31 (Supp. 2008) specify requirements that a mortgagee must follow in conducting the foreclosure sale, including a requirement that the sale must be in the same county as where the property is located, unless the parties consent upon a different-county sale.  The alternative power of sale process requires the mortgagee to conduct two open houses of the property before the foreclosure sale.  HRS § 667-26 (Supp. 2008).  A public notice with very detailed specifications is also required under HRS § 667-27 (Supp. 2008).  HRS § 667-32 (Supp. 1998) requires the affidavit after public sale to contain particularized recitals and sets forth a form that the mortgagee's affidavit must substantially follow.  These requirements, among others, do not appear in HRS §§ 667-5 to 667-10, under whose authority RLP's foreclosure sale was conducted.

The advantage to electing the alternative power of sale process under Part II of Chapter 667 is that, once the affidavit after public sale and the conveyance documents have been recorded, the mortgagor and other claimants "shall be forever barred of and from any and all right, title, interest, and claims at law or in equity in and to the mortgaged property," HRS § 667-33(b)(2), an assurance that HRS

§§ 667-5 to 667-10 do not guarantee.  Further, as already mentioned, a conclusive presumption arises as to the legality, fairness, and reasonableness of the foreclosure sale conducted pursuant to the alternative power of sale process.  HRS § 667-34.

e.g., Hawai'i Gov't Employees Ass'n, AFSCME Local 152, AFL-CIO v. Lingle, 124 Hawai'i 197, 203—04, 239 P.3d 1, 7—8 (2010) (finding that a previous ICA decision, with which the legislature disagreed, was overruled by a statutory amendment); Lee v. United Pub. Workers, AFSCME, Local 646, AFL-CIO, 125 Hawai'i 317, 322—23, 260 P.3d 1135, 1140—41 (App. 2011) (accord).[24]  Instead of prescribing a conclusive presumption or a provision of similar import, HRS § 667-8 (1993) states only that an affidavit averring that the non-judicial foreclosure "has in all respects complied with the requirements of the power of sale and the statute . . . shall be admitted as evidence that the power of sale was duly executed."  (Emphasis added).[25]  Hence, there is no

_____

[24]     These two cases involved a previous decision by the ICA that the Hawai'i Labor Relations Board (HLRB) and the circuit courts had concurrent jurisdiction over complaints arising under previous versions of HRS sections 89-14 and 377-9.  Lee, 125 Hawai'i at 322.  The subsequent statutory amendment explicitly conferred HLRB with exclusive original jurisdiction over such complaints, which this court viewed as an express overruling by the legislature of the ICA's previous decision.  Lingle, 124 Hawai'i at 203-04.

[25]     This provision dates back to the inception of the foreclosure statute in 1874, when its language read:

> If it appears by such affidavit that he has in all respects complied with the requisitions of the power
>
> of sale, in relation to all things to be done by him before selling the property, and has sold the same in the manner required by such power, the affidavit, or a duly certified office copy of the record thereof, shall be admitted as evidence that the power of sale was duly executed.

1874 Haw. Sess. Laws Act XXXIII, § 2, at 31.  This language was not significantly modified by post-Ulrich amendments.  See 1972 Haw. Sess. Laws Act 90, § 9(g), at 363 (setting forth the version of the statute that was valid until its repeal in 2012).

indication that the legislature intended to overrule Ulrich, circumscribe its application, or otherwise modify its effect in the realm of non-judicial foreclosures.  Cf. Lingle, 124 Hawai'i at 203—04, 239 P.3d at 7—8; Lee, 125 Hawai'i at 322—23, 260 P.3d at 1140—41.

**2.    The Amendments to HRS § 667-5 Expanded the Rights of Mortgagors, Further Buttressing Ulrich's Vitality**

The amendments to HRS § 667-5, through 76 years of Ulrich's existence, have added requirements that mortgagees must fulfill in order to accomplish a valid foreclosure sale.  See, e.g., 1967 Haw. Sess. Laws Act 256, § 1 at 383 (requiring mortgagees to record and index the affidavit and copy of the notice of sale); 1989 Haw. Sess. Laws Act 20, § 5 at 56—57 (requiring mortgagees to file copies of foreclosure sale notices with the state director of taxation).  The benefits of some of these added statutory requirements, such as those derived from the 2008 amendments, were meant to accrue to mortgagors so as to expand and bolster the protections to which they are entitled.  See 2008 Haw. Sess. Laws Act 138, § 1 at 370—71 (amending HRS § 667-5 to require mortgagees to hire local attorneys who could facilitate a greater and more convenient transfer of information about foreclosure to mortgagors, and requiring mortgagees to disclose more particularized information upon a mortgagor's request).

Hence, it is inconsistent to assume that the legislature overruled Ulrich and the rights it promulgated at the same time as when the legislature expanded the rights of mortgagors. See In re Gibbs, 522 B.R. at 290 (holding that the increase in mortgagors' rights effectuated by the 2008 amendment to HRS § 667-5 was consistent with the view that the legislature approved of Ulrich). The more logical conclusion, consistent with the expansion of the rights of mortgagors in the foreclosure statute, is that the legislature approved of Ulrich and supplemented it with more robust statutory protections. See id.

### 3. Ulrich is Applicable to Real Property Non-Judicial Foreclosures

When Ulrich was decided, the version of the foreclosure statute then existing was contained in RLH §§ 4724—4728. RLH § 4724, the 1935 counterpart of HRS § 667—5, was applicable to all mortgage foreclosure sales regardless of whether the subject matter was real property or chattels. The exclusion of chattels from HRS § 667—5 was not effectuated until its 1972 amendment. See 1972 Haw. Sess. Laws Act 90, §9 at 362. Even then, there is no indication that the legislature excluded chattels from the application of HRS § 667—5 in order to circumscribe Ulrich's application to chattels only. See Report of Committee on Coordination of Rules and Statutes Vol. 2, §

667-5 (1971).  The apparent rationale of the 1972 amendment was merely to conform HRS § 667-5 to UCC article 9, which governs secured transactions of personal property.  See id.

Ulrich similarly did not limit its holding to chattel mortgages, although the facts of that case involved chattels only.  Restricting it would have been illogical, not only because the foreclosure statute involved in Ulrich did not differentiate between chattels and real property, RLH §§ 4724—4728; see In re Gibbs, 522 B.R. at 290 (reasoning similarly), but also because Ulrich's rationale applies with equivalent, if not greater, force in the foreclosure sale of real property.

The motivation for the requirements set forth in Ulrich is to protect the mortgagor from being wrongfully and unfairly taken advantage of by the mortgagee, Ulrich, 35 Haw. at 168, and this purpose is not rendered irrelevant merely because the subject matter of a foreclosure sale is real property rather than chattels.  To the contrary, where, as here, the property at issue is the primary residence of an individual, the rationale underlying Ulrich's requirements is only strengthened.  Cf. Ulrich, 35 Haw. at 159—60 n.1 (concerning the foreclosure sale of office property, interest in law practice, share in earned attorneys' fees, and household belongings).  Thus, reasoning that Ulrich's application is confined to only chattel mortgages,

see, e.g., Lima, 943 F. Supp. 2d at 1099, is not analytically persuasive.

### 4. The Duties of Mortgagees under Ulrich

To summarize, Ulrich requires mortgagees to exercise their right to non-judicial foreclosure under a power of sale in a manner that is fair, reasonably diligent, and in good faith, and to demonstrate that an adequate price was procured for the property.[26] Ulrich, 35 Haw. at 168. In instances where the mortgagee assumes the role of a purchaser in a self-dealing transaction, the burden is on the mortgagee, or its quitclaim transferee or non-bona fide successor,[27] to establish its compliance with these obligations. Id. Its failure to do so would render the foreclosure sale voidable and could therefore be set aside at the timely election of the mortgagor. See id.

---

[26] A more generalized articulation of these duties may be found in Silva v. Lopez, 5 Haw. 262 (Haw. Kingdom 1884), which states "that the law requires the mortgagee, in the exercise of his power, to use discretion in an intelligent and reasonable manner, not to oppress the debtor or to sacrifice his estate." Id. at 265.

[27] A non-bona fide purchaser is one who does not pay adequate consideration, "takes with knowledge that his transferor acquired title by fraud[,] or . . . buys registered land with full notice of the fact that it is in litigation between the transferor and a third party." Akagi v. Oshita, 33 Haw. 343, 347 (1935); Achiles v. Cajigal, 39 Haw. 493, 499 (1952); see generally 92A C.J.S. Vendor and Purchaser § 547 (2010) (defining a bona fide purchaser as "one who acquires an interest in a property for valuable consideration, in good faith, and without notice of any outstanding claims which are held against the property by third parties").

B.    Summary Judgment in Favor of Kondaur was Erroneously
                          Granted
    1.    Summary Judgment and the Elements of Ejectment

Under settled law, "[t]his court reviews a circuit

court's grant or denial of summary judgment de novo."  Price v.

AIG Hawai'i Ins. Co., 107 Hawai'i 106, 110, 111 P.3d 1, 5 (2005);

see Thomas v. Kidani, 126 Hawai'i 125, 128, 267 P.3d 1230, 1233

(2011).  "[S]ummary judgment is appropriate if the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law."  Price, 107 Hawai'i

at 110 (quoting Haw. Cmty. Fed. Credit Union v. Keka, 94 Hawai'i

213, 221, 11 P.3d 1, 9 (2000)).  Further, all evidence and

inferences therefrom "must be viewed in the light most favorable

to the non-moving party."  Id. (quoting Keka, 94 Hawai'i at 221,

11 P.3d at 9).

The moving party has the initial burden of

"demonstrating the absence of a genuine issue of material fact."

Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co., 116

Hawai'i 277, 301, 172 P.3d 1021, 1045 (2007) (emphasis omitted)

(quoting Young v. Planning Comm'n of the Cnty. of Kaua'i, 89

Hawai'i 400, 407, 974 P.2d 40, 47 (1999)).  This burden may be

discharged "by demonstrating that . . . if the case went to

33

trial[,] there would be no competent evidence to support a judgment for his or her opponent." Id. (alteration in original) (quoting Young, 89 Hawai'i at 407, 974 P.2d at 47). Only with the satisfaction of this initial showing does the burden shift to the nonmoving party to respond "by affidavits or as otherwise provided in HRCP Rule 56[,] . . . set[ting] forth specific facts showing that there is a genuine issue for trial." Id. (quoting Young, 89 Hawai'i at 407, 974 P.2d at 47).

In order to maintain an ejectment action, the plaintiff "must necessarily prove that [he or she] owns the parcel[] in issue," State v. Magoon, 75 Haw. 164, 175, 858 P.2d 712, 718—19 (1993); see State v. Midkiff, 49 Haw. 456, 460, 421 P.2d 550, 554 (1966), meaning that he or she must have "the title to and right of possession of" such parcel, Carter v. Kaikainahaole, 14 Haw. 515, 516 (Haw. Terr. 1902). Additionally, the plaintiff must establish that "possession is unlawfully withheld by another." Id. In this case, Kondaur submitted a certified copy of its quitclaim deed from RLP as part of its MSJ. The quitclaim deed recited that RLP conveyed the Property to Kondaur but made "no representations, warranties or promises regarding any claims by LEIGH MATSUYOSHI, her heirs, successors or assigns." The certified copy of the quitclaim deed and all of its attachments suffice to establish only that Kondaur has an ownership interest in and right of possession of

the Property, subject to Matsuyoshi's title and ownership interest in the same Property.  This conditional status of Kondaur's title originates from the language of Kondaur's quitclaim deed, which specifically carves out from Kondaur's interest any claims that Matsuyoshi may still have on the Property.  It is therefore clear from the language of the deed that it does not convey a title superior to that of Matsuyoshi's title and interest because it goes so far as acknowledging that Matsuyoshi may have some ownership claim on the Property.

Moreover, the very nature of a quitclaim deed also circumscribes the interest that Kondaur could have in the Property.  Because a quitclaim deed is capable of conveying only that which the predecessor-in-interest already possessed in the first place, Kondaur has whatever rights RLP had on the Property, and the quitclaim deed in no way indicates that Kondaur has an absolute and unassailable interest in the Property.  See Hustace v. Kapuni, 6 Haw. App. 241, 245, 718 P.2d 1109, 1112 (1986) (stating that the grantee "acquired whatever interest the [grantors] may have had in the property"); see also Hagan v. Gardner, 283 F.2d 643, 646 (9th Cir. 1960) (stating that a quitclaim deed "operates to transfer only what right, title and interest the grantor may have").

Thus, Kondaur's title to and interest in the Property depends on whether RLP actually had valid title and interest in

the Property to convey.  Because the title to the Property deeded by RLP to Kondaur derives from a non-judicial foreclosure sale of the Property, the strength and validity of Kondaur's title is unavoidably intertwined with the validity of the foreclosure sale.  See Lee v. HSBC Bank USA, 121 Hawai'i 287, 292, 218 P.3d 775, 780 (2009) (holding that an agreement created at a defective and invalid foreclosure sale is void and unenforceable and that, in such a case, the purchaser is "entitled only to return of his or her downpayment plus accrued interest").  It therefore became incumbent upon Kondaur to demonstrate that the foreclosure sale was conducted in accordance with Ulrich to prove that its quitclaim deed is valid and superior to any claims that Matsuyoshi may have on the Property.[28]

### 2. Kondaur Failed to Satisfy its Initial Burden

Kondaur's quitclaim deed carries with it all of the infirmities that the prior non-judicial foreclosure might have occasioned upon the deed.  Hustace, 6 Haw. App. at 245, 718 P.2d at 1112; Hagan, 283 F.2d at 646.  Pursuant to the principles embodied by Ulrich, RLP's self-dealing of the Property triggered

---

[28]    Similarly, because a non-bona fide purchaser does not take title free and clear of all interests, see 92A C.J.S., supra, § 547, that purchaser, in order to enforce its interest and defeat a mortgagor's claim, would have to prove that the mortgagee-transferor complied with the requirements of Ulrich.

its burden to prove in the summary judgment proceeding that the foreclosure "sale was regularly and fairly conducted in every particular."  Ulrich, 35 Haw. at 168.  This burden was transferred to Kondaur by virtue of its quitclaim deed, the validity of which, vis-à-vis Matsuyoshi's interest in the Property, is dependent on the validity of the foreclosure sale.

Accordingly, Kondaur, as a quitclaim transferee of a self-dealing mortgagee (i.e., RLP), was required under Ulrich to introduce evidence that RLP exercised its right to non-judicial foreclosure under a power of sale in a manner that was fair, reasonably diligent, and in good faith, and to demonstrate that an adequate price was procured for the Property.  Ulrich, 35 Haw. at 168.[29]  A prima facie case demonstrating compliance with the foregoing requirements would have shifted the burden to Matsuyoshi to raise a genuine issue of material fact.

---

[29]     Compliance with the Ulrich requirements is an ingredient of a valid non-judicial foreclosure.  In turn, a quitclaim deed derived from a valid non-judicial foreclosure would divest the mortgagor of all ownership claims to a disputed property.  See Cooper v. Island Realty Co., 16 Haw. 92, 103 (Haw. Terr. 1904) (stating that foreclosure of a mortgage extinguishes the equity of redemption and the legal estate held by the mortgagor); 74 C.J.S. Quieting Title § 35 (2010) ("Foreclosure of the mortgage divests the mortgagor . . . of title or interest in the property covered by the mortgage.").

Conversely, if the Ulrich requirements were not satisfied, a quitclaim deed would convey only a voidable interest in the property.  See Ulrich, 35 Haw. at 168 (reasoning that an unfair mortgage foreclosure sale was voidable at the timely election of the mortgagor); cf. Lee, 121 Hawai'i at 292, 218 P.3d at 780 (concluding that "an agreement created at a foreclosure sale . . . is void and unenforceable where the foreclosure sale is invalid under the statute").

The only evidence produced by Kondaur with respect to the manner in which the sale was conducted was derived from RLP's Affidavit of Sale prepared by Leu, RLP's attorney. The Affidavit of Sale merely "certifies that in compliance with and pursuant to Hawaii Revised Statutes 667-5 through 667-10 and th[e] . . . Mortgage, Mortgagees or its representative, or Affiant or her representative" conducted the non-judicial foreclosure sale in compliance with all statutory requirements and the terms of the Mortgage.[30] But the Affidavit of Sale fails to provide any averments as to the fairness and regularity of the foreclosure sale or as to whether RLP conducted the

---

[30]    HRS § 667-7 (Supp. 2008) provides:

(a) The notice of intention of foreclosure shall contain:

 (1) A description of the mortgaged property; and

 (2) A statement of the time and place proposed for the sale thereof at any time after the expiration of four weeks from the date when first advertised.

(b) The affidavit described under section 667-5 may lawfully be made by any person duly authorized to act for the mortgagee, and in such capacity conducting the foreclosure.

HRS § 667-9 (1993) states:

If the mortgage was executed by a man having at the time no lawful wife, or if the mortgagor being married, his wife joined in the deed in token of her release of dower, the sale of the property in the mode aforesaid shall be effectual to bar all claim and possibility of dower in the property.

The full text of HRS § 667-5 (Supp. 2008) is stated in note 11, and the relevant portion of HRS § 667-8 (1993) can be found on pages 28 and 39-40.

foreclosure sale in a diligent and reasonable manner.[31] This document does not even speak of any reason as to why the foreclosure sale was conducted on O'ahu when the Property is on Kaua'i.[32] Although the Affidavit of Sale states that the Property was sold for $416,900.20 at the foreclosure sale, it does not make any declaration concerning the adequacy of this price.[33]

While HRS § 667-8 at that time provided that an affidavit averring that the non-judicial foreclosure "has in all respects complied with the requirements of the power of sale and

---

[31] The foreclosure statute required mortgagees to file in the Bureau "the mortgagee's affidavit, setting forth the mortgagee's acts in the premises fully and particularly." HRS § 667-5(d) (emphasis added).

[32] Kondaur asserted in the circuit court and the ICA that "conducting the public sale on the island of Oahu [made it possible for] the foreclosing mortgagee . . . to conduct the sale in a larger market with more prospective purchasers." This assertion fails to establish that the foreclosure sale satisfied the requirements of Ulrich, not only because it is conclusory but also because evidence substantiating this assertion was not submitted in support of the MSJ. See Thomas v. Kidani, 126 Hawai'i 125, 132—33, 267 P.3d 1230, 1237—38 (2011) (conclusory assertions as to essential elements are insufficient to satisfy summary judgment burden); Exotics Hawaii-Kona, Inc., 116 Hawai'i at 316 n.4, 172 P.3d at 1060 n.4 (stating that a conclusion must be supported by a "factual basis and the process of reasoning which makes the conclusion viable" (internal quotation mark and emphasis omitted) (quoting Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993)); Kondaur Capital Corp. v. Matsuyoshi, 134 Hawai'i 342, 352, 341 P.3d 548, 558 (2014) (consideration of a circuit court's summary judgment award is limited to evidence presented to and considered by the circuit court).

In any event, because the Property is located on Kaua'i and the terms of the sale included a clause requiring the buyer to take the Property "AS IS" and "WHERE IS," it is at least a question of fact whether the foreclosure sale actually benefited from the larger pool of potential real estate buyers on Oah'u. The record simply is insufficient to prove or disprove the advantages or disadvantages of selling an "as is" residential property on a different island.

[33] A 2008 tax assessment of the Property placed its total net value at $473,000.

the statute . . . shall be admitted as evidence that the power of sale was duly executed," the Ulrich requirements are not statutorily or contractually based.  Instead, they are separate and distinct from the requirements of the foreclosure statute and the operative mortgage.  See Ulrich, 35 Haw. at 172—73 (recognizing that the foreclosure statute did not require that the foreclosure sale be publicized, but in any event finding that the mortgagee failed to act reasonably by failing to do so).  Hence, a mortgagee's minimal adherence to the statutory requirements and the terms of the mortgage under which the foreclosure sale is conducted—the only facts that RLP's Affidavit of Sale supports—does not establish that the foreclosure sale similarly satisfied the Ulrich requirements.[34] See id.

---

[34]    For example, the fact that HRS § 667-5 does not contain a requirement that a foreclosure sale must be conducted in the same county as where the Property is located does not automatically mean that a self-dealing mortgagee may always conduct a different-county sale.  While a different-county sale does not violate HRS § 667-5, it does not mean that such a sale will similarly be valid under Ulrich, which sets forth duties independent of those imposed by the statute.  The Ulrich requirements, depending on the circumstances of a particular property and the foreclosure sale, could necessitate a foreclosure sale to be held in the county in which the property is located.  Hence, a different-county sale may or may not comport with Ulrich depending on, among other things, the type, value, and location of the property; sale or auction conditions (e.g., clause stating that the sale is "as is," "where is," etc.); amount and type of notification to the mortgagor; and amount and type of publicity regarding the sale.  Thus, we reject Kondaur's assertion that it was not required to conduct the foreclosure sale in the same county as where the Property is located because HRS § 667-5 did not contain such a requirement.

Since Kondaur failed to satisfy its initial burden of showing that RLP conducted the foreclosure sale in a manner that was fair, reasonably diligent, in good faith, and would obtain an adequate price for the Property, the burden never shifted to Matsuyoshi and summary judgment was erroneously granted.  See Morinoue v. Roy, 86 Hawaiʻi 76, 81, 947 P.2d 944, 949 (1997) (vacating grant of summary judgment because movant failed to establish prima facie case of adverse possession).  As a result, Matsuyoshi did not have to raise any genuine issue of material fact and, contrary to Kondaur's argument, was not preliminarily obligated to establish that she suffered actual prejudice from the foreclosure sale being conducted on Oʻahu rather than on Kauaʻi.

Kondaur maintains that bearing the burden of proving compliance with Ulrich is tantamount "to disprov[ing] every possible defense that may or may not be raised by the opposing party . . . [to] a non-judicial foreclosure sale"—a task that a summary judgment movant is not required to discharge.  We disagree.  The Ulrich requirements are not meant to serve as a mortgagor's defense against a self-dealing mortgagee or, as here, that mortgagee's quitclaim transferee, but the requirements were crafted to serve as affirmative obligations that mortgagees must fulfill when utilizing the process of non-judicial foreclosure.  See Ulrich, 35 Haw. at 168 (requiring the

mortgagee to affirmatively act in a manner that is not wrongful and unfair to the mortgagor, and assigning the burden to the self-dealing mortgagee to prove compliance with this requirement).  Here, since a prima facie case of ejectment requires Kondaur to prove ownership of the subject property, see Magoon, 75 Haw. at 175, 858 P.2d at 718—19; Midkiff, 49 Haw. at 460, 421 P.2d at 554, and Kondaur's ownership depends on the validity of RLP's self-dealing foreclosure sale, RLP's adherence to the Ulrich requirements is merely an element of, and not a defense to, Kondaur's ejectment action.  Therefore, the burden of proving compliance with the Ulrich requirements is properly assigned to Kondaur, the quitclaim transferee of RLP.  Further, as already discussed, HRS §§ 667-5 to 667-10 do not provide a conclusive presumption as to the validity of a foreclosure sale once it has been proven that the mortgagee complied with the mortgage terms and the statute.  Cf. HRS § 667-34.  The absence of such a conclusive presumption is consistent with requiring a self-dealing mortgagee, or its quitclaim transferee or non-bona fide successor, to prove compliance with Ulrich.[35]

---

[35]  It also bears noting that it would be unduly onerous to require a mortgagor to prove that the self-dealing mortgagee disregarded Ulrich's requirements since, as a practical matter, the facts that bear upon the conduct of the foreclosure sale are most likely in the possession and knowledge of the self-dealing mortgagee, or its quitclaim transferee or non-bona fide successor, not the mortgagor.

## IV.  CONCLUSION

Accordingly, the ICA's March 5, 2015 Judgment on Appeal and the circuit court's September 20, 2012 "Judgment on Order Granting Plaintiff Kondaur Capital Corporation's Motion for Summary Judgment Against All Defendants on Complaint Filed June 5, 2012" are vacated, and the case is remanded to the circuit court for further proceedings.

James J. Bickerton,
Bridget G. Morgan and
Joe Moss
for petitioner

Michael C. Bird and
Thomas J. Berger
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson



43